**Affirmed in Part, Reversed in Part, and Remanded and Opinion filed March 6, 2026.**



In The

# Fifteenth Court of Appeals

### NO. 15-24-00010-CV

**TEXAS DEPARTMENT OF PUBLIC SAFETY AND CHRISTINA MITCHELL, IN HER OFFICIAL CAPACITY AS 38TH JUDICIAL DISTRICT ATTORNEY, Appellants**

V.

**TEXAS TRIBUNE; ABC NEWS; CBS NEWS; CABLE NEWS NETWORK, INC.; DOW JONES & CO.; GANNETT CO., INC.; GRAHAM MEDIA GROUP, HOUSTON; GRAHAM MEDIA GROUP, SAN ANTONIO; NBC NEWS; THE NEW YORK TIMES CO.; PRO PUBLICA, INC.; SCRIPPS MEDIA, INC.; TEGNA INC.; AND THE WASHINGTON POST, Appellees**

**On Appeal from the 53rd District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-22-003502**

## OPINION

On May 24, 2022, a lone gunman murdered nineteen children and two teachers at Robb Elementary School in Uvalde. The crime horrified the country and

shook the Uvalde community to its core, sparking an extensive investigation into the murders and the failure of hundreds of on-the-scene law enforcement officers to intervene in time to save children's lives.

After the Texas Department of Public Safety (DPS) withheld information from the investigation responsive to the Texas Public Information Act[1] (PIA) requests posed by various news organizations, the News Organizations[2] in this case filed this lawsuit seeking a writ of mandamus to compel DPS to disclose the information under the PIA. The PIA requests at issue are not of ordinary scope. The responsive information constitutes approximately 2.8 terabytes of data. A terabyte is a "unit of digital data that is equal to about 1 trillion bytes," or 1,000 gigabytes. *What is Terabyte?*, GEEKSFORGEEKS (July 23, 2025), https://tinyurl.com/yey8cu6j. To put that into perspective, it would take 1,498 CD-ROM discs to store just 1 terabyte of information, or the data equivalent of 310,000 pictures or 500 hours' worth of film content. Tim Fisher, *How Big Is a Terabyte, a Petabyte, or an Exabyte? Here's the Real Answer*, LIFEWIRE (Sept. 22, 2025), https://tinyurl.com/yt9htpbd; Brady Gavin, *How Big are Gigabytes, Terabytes, and Petabytes?*, HOW-TO GEEK (May 25, 2018, 6:24 AM), https://tinyurl.com/bzjtef6r. Multiply that figure by 2.8, and that is the amount of information at issue here. Nor was there anything ordinary about the timing of the PIA requests. The News Organizations began making the PIA requests *mere days* after the mass shooting—when the investigation was in its earliest stages, before the relevant law enforcement authorities determined whether to charge any of the hundreds of persons on campus for acts related to the

---

[1] Tex. Gov't Code §§ 552.001–.407.

[2] The News Organizations consist of appellees Texas Tribune; ABC News; CBS News; Cable News Network, Inc.; Dow Jones & Co.; Gannett Co., Inc.; Graham Media Group, Houston; Graham Media Group, San Antonio; NBC News; The New York Times Co.; Pro Publica, Inc.; Scripps Media, Inc.; Tegna Inc.; and The Washington Post.

extraordinary loss of life, and before the relevant authorities determined whom to charge in the event that such prosecutions were warranted.

As the movants in a traditional motion for summary judgment, the News Organizations bore the burden to show that no genuine issue of material fact existed and that they were entitled to judgment on their PIA mandamus action as a matter of law. DPS responded to the summary judgment motion with evidence that releasing the information sought by the News Organizations would interfere with the investigation of the mass shooting and any future prosecution of crimes related to the mass shooting. Nevertheless, the trial court granted summary judgment for the News Organizations requiring *all* of this information to be released, subject to certain redactions, rejecting wholesale DPS's invocation of the law enforcement exception to the PIA. That exception excludes certain information from disclosure when releasing it would interfere with a law enforcement investigation or the prosecution of a crime.[3]

Applying fundamental principles of Texas law governing summary judgment practice—principles that govern both ordinary cases and extraordinary cases—we hold that DPS carried its burden of supplying more than a mere scintilla of evidence to support the law enforcement's exception's application. Significantly, we do not hold that each file and video clip contained in the massive volume of responsive information is forever shielded from public view. Rather, we conclude that DPS cleared the bar of defeating a summary judgment with respect to the responsive information and is entitled to proceed to a trial. At trial, DPS will bear the burden of proving that the information sought qualifies for the law enforcement exception to disclosure. But that was not DPS's burden at this early juncture.

---

[3] Tex. Gov't Code § 552.108(a)(1), (b)(1).

We further hold that the trial court erred by granting summary judgment requiring disclosure of materials that did not exist or were not yet in DPS's possession as of the date of the PIA requests. We also hold that the trial court erred by granting summary judgment requiring release of records that DPS obtained from federal sources. Finally, we conclude that the trial court did not err by striking the plea in intervention filed by Uvalde District Attorney Christina Mitchell. We AFFIRM the denial of the plea in intervention. We REVERSE the remainder of the judgment and REMAND for further proceedings.

## BACKGROUND

### I. The Shooting and Requests for Information.

On May 24, 2022, an 18-year-old former student of Robb Elementary in Uvalde shot his grandmother, crashed her truck in a ditch near the school, made his way to the school, and killed twenty-one people and injured seventeen others. Three hundred and seventy-six officers from almost two dozen state, federal, and local law enforcement agencies responded to the shooting, including ninety-one from DPS. Although some arrived within minutes of the gunman, approximately seventy-four minutes elapsed between the time the gunman entered the school and when officers breached the room where he was located and killed him. The loss of life and time it took to neutralize the gunman immediately prompted questions about law enforcement's response.

Within mere days of the shooting, multiple state and national news media organizations began submitting public information requests to DPS seeking disclosure of information relating to the shooting.[4] The requests sought a wide array

---

[4] One was submitted in July and another in September 2022, but the rest were submitted in May and June 2022.

4

of mostly DPS-related information consisting of the following:

- information generated during or soon after the shooting, including audio recordings (*e.g.*, radio traffic, dispatch transmissions, and 911 calls), video recordings (*e.g.*, footage from body cameras, police cruisers, and surveillance cameras located on and around the school), and written communications (*e.g.*, emails and texts involving certain DPS employees and dispatch, communication, and call logs);

- post-shooting documentary materials, including various reports (*e.g.*, incident, toxicology, ballistic, autopsy) and common investigation-related documents (*e.g.*, notes and transcripts from interviews with responding law enforcement officers, timelines, search warrants, and evidence logs);

- details about DPS personnel and SWAT members who responded to the shooting or were assigned to the surrounding area, along with training issued on active-shooter situations; and

- records relating to an investigation into an alleged 2018 mass shooting plot at a Uvalde junior high and records for Uvalde CISD Police Chief Pete Arredondo and the gunman.

DPS released some of the requested information,[5] but it sought rulings from the Attorney General's Open Records Division (ORD) regarding the bulk of it because DPS did not believe the information was subject to disclosure.[6]

In seven letters submitted to ORD between June 9 and 28, 2022, DPS argued that the requested information was excepted from disclosure by the PIA's law enforcement exception because releasing it would interfere with an ongoing investigation and prosecution of the case, *see* Tex. Gov't Code § 552.108(a)(1), compromise law enforcement purposes by revealing techniques or procedures, *see*

---

[5] 1,118 pages of records, according to the News Organizations.

[6] *See* Tex. Gov't Code § 552.301(a) ("A governmental body that receives a written request for information that it wishes to withhold from public disclosure and that it considers to be within one of the exceptions under Subchapter C must ask for a decision from the attorney general about whether the information is within that exception if there has not been a previous determination about whether the information falls within one of the exceptions.").

*id.* § 552.108(b)(1), or both.[7] DPS submitted representative samples of the withheld documents to ORD for review. The News Organizations responded with letters arguing that the law enforcement exception did not apply or could not be claimed for information that DPS had previously disclosed.

## II.     Details Emerge About the Shooting and Law Enforcement's Response.

While the News Organizations, DPS, and ORD engaged under the PIA, details about the shooting and law enforcement's response began to emerge through reports, interviews, and other sources.

In early June, the Speaker of the Texas House of Representatives established a committee to investigate the shooting. The committee issued a seventy-seven-page interim report the next month. The report in part detailed law enforcement's response and included a description of its "shortcomings and failures." Among other things, it states "Uvalde CISD and its police department failed to implement their active shooter plan and failed to exercise command and control of law enforcement responding to the tragedy," and although "[h]undreds of responders from numerous law enforcement agencies … quickly arrived on the scene," none of them "seized the initiative to establish an incident command post." This in turn adversely affected "the flow of the information necessary to inform critical decision making." The report cautioned that the committee's "work is not complete," and it acknowledged the frustrating reality that a "complete and thorough investigation can take months or even years to confirm every detail, especially when this many law enforcement officers are involved."

---

[7] DPS also argued that disclosure was not warranted in some instances based on other PIA exceptions and relevant authorities, including Government Code Sections 522.101, 552.107, 552.111, provisions contained in the Texas Homeland Security Act, the deliberative process privilege, and the attorney-client privilege.

DPS commissioned a report by the Advanced Law Enforcement Rapid Response Training (ALERRT) Center "to assess the law enforcement response."[8] In the "Tactical Assessment" part of its July 2022 report, ALERRT "commend[ed] the officers for quickly entering the building and moving towards the sounds of gunfire." But what the responders did next was inconsistent with ALERRT and FBI protocols to "first **Stop the Killing** and then **Stop the Dying**"—the officers lost "momentum" when they "were fired at," "fell back," and did not "regain momentum and gain access to critically injured people" for "more than an hour." Similar to the House report, ALERRT's report noted that it "should not be considered a definitive or final report as all investigatory options have not been exhausted at this point."

In September 2022, DPS Director Colonel McCraw gave an interview to Austin-based KVUE where he also criticized the law enforcement response, describing it as an "abject failure." McCraw explained that District Attorney Mitchell was the one tasked with assessing whether the responding officers had any potential criminal responsibility:

> The district attorney has made it very clear they're going to evaluate every officer that responded that day for criminal culpability. So regardless of what we determine in the end, ultimately, she and the grand jury will determine whether there's other culpability by any officer in that particular hallway on that day.

McCraw stated that Mitchell had asked DPS "to take the lead on the investigation as opposed to ISD or Uvalde PD and the sheriff's office." With DPS handling the investigation, McCraw confirmed that DPS was deferring to Mitchell's request to withhold any information about the investigation, consistent with DPS policy regarding the release of investigation-related information. He reasoned that by

---

[8] ALERRT "is nationally recognized as the preeminent active shooter / attack response training provider in the nation."

releasing information "there's always concern that we're going to interfere with the case. We're going to compromise it in some way, shape or form."

Mitchell testified similarly that DPS must withhold information about its investigation to protect both the investigation and any possible prosecution by her office of the law enforcement personnel who responded to the shooting.

## III. The Trial Court Proceedings and ORD Rulings.

In early August 2022, the News Organizations filed a petition for a writ of mandamus seeking to compel DPS to produce the information requested after the shooting. They alleged that DPS could not meet its burden to withhold the information—part of which had already been publicly disclosed—under Government Code Section 552.108(a)(1) or (b)(1). DPS answered and filed a plea to the jurisdiction, arguing that some of the information requests had been mooted.

Between August 16 and 25, 2022, ORD issued four letter rulings concluding that most of the information DPS had withheld was excepted from disclosure under the law enforcement and other identified exceptions. Determining that the information was excepted from disclosure under Section 552.108(a)(1), which excludes information from disclosure when its release "would interfere with the detection, investigation, or prosecution of crime," ORD accepted that DPS had "explain[ed] how and why the release of the requested information would interfere with law enforcement" by representing that "the information at issue relates to a pending criminal investigation."

ORD also agreed with DPS that the information was excepted from disclosure under Government Code Section 552.108(b)(1), which excepts from disclosure an internal record or notation that a law enforcement agency or prosecutor maintains for internal use in matters related to law enforcement or prosecution when such release "would interfere with law enforcement or prosecution." ORD accepted

DPS's representations that releasing the information "could give criminals a tactical advantage and jeopardize officers' safety" and would reveal "department techniques used to investigate and detect activities of suspected criminal elements; how information is assessed and analyzed; how information is shared among partner law enforcement agencies[;] and the lessons learned from the analysis of prior criminal activities." (alteration in original). DPS released the records that were not found to be excepted under the PIA but withheld the rest of the information—an amount totaling approximately 2.8 terabytes of data.[9]

A few months after ORD's rulings, the News Organizations filed a traditional motion for summary judgment on the ground that DPS may not withhold the information at issue pursuant to the law enforcement exception or other exceptions.[10] As to the law enforcement exception, the News Organizations argued that releasing the information would not interfere with any criminal investigation or prosecution of law enforcement. The News Organizations also argued that the PIA "does not vest a sole district attorney with the authority to dictate when information is released to the public . . . ." In its response, DPS argued that summary judgment on the law enforcement exception was improper because Mitchell had affirmed under oath that releasing the requested information would interfere with DPS's investigation and any prosecution by her office based upon the investigation. Both DPS and the News Organizations included in their summary-judgment evidence the transcript from the

---

[9] ORD ruled that "to the extent the department previously released any of the information at issue to a member of the public voluntarily, it may not now withhold any such information from any of the requestors under section 552.108 . . . ." ORD also ruled disclosure was required for "basic information," as that term is used in Government Code Section 552.108(c), and all information not marked as protected under Government Code Sections 552.107(1), 552.108, 552.111, and 552.101 in conjunction with 418.176.

[10] Government Code Sections, 552.107(1), 552.108, 552.111, and 552.101 in conjunction with 418.176.

hearing on the application for mandamus in another PIA mandamus action seeking some of the same information the News Organizations seek here, *Roland Gutierrez v. Texas Department of Public Safety*, No. D-1-GN-22-002848 (419th Dist. Ct., Travis County, Tex. June 22, 2022).

Shortly before the hearing on the News Organizations' summary judgment motion, Mitchell filed a plea in intervention and a response to the motion. She claimed to have "a justiciable interest in preventing the disclosure of information obtained by [DPS] during its ongoing investigation into the" shooting because she was the one with "prosecutorial jurisdiction over the location of the Robb Elementary incident," she had "not yet decided whether probable cause exists to submit an indictment to a grand jury," and disclosure "could have a detrimental effect on whatever prosecutions her office may pursue based, in part, on [DPS's] investigation." The News Organizations moved to strike the plea, arguing that Mitchell did not satisfy the standard for intervention because she lacks a justiciable interest.

At the hearing on the News Organizations' motion for summary judgment, DPS tendered to the trial court for in camera review the same representative sample of documents that DPS had given ORD in connection with its review of DPS's claimed exceptions to the information requests. That same day, the trial court signed an agreed judgment on DPS's jurisdictional plea that dismissed seven of the News Organizations' requests for information.

In late June 2023, the trial court issued a letter ruling granting the News Organizations' summary judgment motion, ordering DPS to submit "a detailed log of proposed redactions" required by law, and requesting that the parties confer on the proposed form of a final judgment.

In September 2023, the trial court after a hearing granted the News

Organizations' motion to strike and struck Mitchell's plea in intervention, finding that she had "not shown a justiciable interest to intervene . . . ." The parties eventually came to an agreement regarding which records were subject to mandatory redaction. Two months later, the trial court signed a final judgment granting the News Organizations' motion for summary judgment in its entirety and ordering DPS to release all information responsive to twenty-eight requests identified therein, excluding the information subject to mandatory redaction as reflected in four sealed exhibits attached to the final judgment. DPS and Mitchell then filed this appeal.

## THE SUMMARY JUDGMENT

DPS presents three issues seeking reversal of the PIA summary judgment: (1) the trial court erred as a matter of law by ordering DPS to release to the public information that did not exist or was not in DPS's possession until after the date of the Plaintiffs' PIA requests; (2) the trial court erroneously ordered release of information when DPS had raised a fact issue about whether such release would reveal information that would interfere with the detection, investigation, or prosecution of crime or that may serve as evidence to support a criminal prosecution of individuals whose actions may have contributed to the tragedy; and (3) the trial court erred as a matter of law by ordering DPS to release to the public information obtained from federal agencies that is exempt from disclosure under federal law. For the reasons explained below, we sustain DPS's issues.

## I.     Legal Standard

This case concerns the interplay between the Public Information Act and Texas Rule of Civil Procedure 166a[11] governing summary judgment motions.

---

[11] Rule 166a was recently amended to add new deadlines for rulings and responses to the motion, among other changes, but the substance of the review standard has not changed. Our citations are to the version of Rule 166a that was in effect at the time of the trial court proceedings.

"The PIA embodies the State's policy that 'each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees.'" *Paxton v. City of Dall.*, 509 S.W.3d 247, 251 (Tex. 2017) (quoting Tex. Gov't Code § 552.001(a)). To that end, the PIA "guarantees access to public information . . . ." *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). Public information is broadly defined to mean "information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business" either "by a governmental body," "for a governmental body" if the governmental body owns the information or has a right of access to it, or "by an individual officer or employee of a governmental body . . . ." Tex. Gov't Code § 552.002(a). The PIA also broadly defines "governmental body," which means, among other entities, a "department," "institution," or "agency" that is "within or is created by the executive or legislative branch of state government . . . ." *Id.* § 552.003(1)(A)(i).

The general "right to access" afforded under the PIA, however, is subject to numerous exceptions that "embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *City of Dallas*, 509 S.W.3d at 251 (quoting *Cox*, 343 S.W.3d at 114). These "exceptions to disclosure [are to] be construed narrowly." *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 299 (Tex. 2011). One such exception is the law enforcement exception, which "excepts from disclosure information which would reveal law enforcement techniques to the public, unduly interfere with law enforcement, and make it more difficult for an agency to do its job." *A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 678 (Tex. 1995) (citing Tex. Gov't Code § 552.108). This appeal involves two of its subparts—(a)(1) and (b)(1). Section

552.108(a)(1) provides that "[i]nformation held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of a crime is excepted" from required disclosure if "release of the information would interfere with the detection, investigation, or prosecution of crime." Tex. Gov't Code § 552.108(a)(1). Section 552.108(b)(1) provides that "[a]n internal record or notation of a law enforcement agency or prosecutor that is maintained for internal use in matters relating to law enforcement or prosecution is excepted" from disclosure if "release of the internal record or notation would interfere with law enforcement or prosecution." *Id.* § 552.108(b)(1).

Whether information is subject to the PIA and whether an exception to disclosure applies are questions of law. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 357 (Tex. 2000). To withhold public information, the "governmental entity must demonstrate that the requested information is not within the scope of the [PIA] or that it falls within one of [PIA's] specific exceptions to the disclosures requested." *Jackson*, 351 S.W.3d at 291.

Although DPS ultimately must shoulder the burden of proving the law enforcement exception's applicability at trial, *see Univ. of Tex. Sys. v. Paxton*, No. 03-14-00801-CV, 2017 WL 1315374, at *5 (Tex. App.—Austin April 7, 2017, no pet.) (mem. op.), this case comes to us on summary judgment. Texas Rule of Civil Procedure 166a sets out the standard governing summary judgment proceedings. In a traditional motion for summary judgment, the movant bears the burden of showing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). If the non-movant opposes a motion for traditional summary judgment by invoking an affirmative defense, the non-movant must produce summary judgment evidence sufficient to

raise an issue of fact on each element of that affirmative defense to avoid summary judgment. *See Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).

We review a summary judgment de novo, viewing the evidence presented in the motion and the response in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)).

Applying the familiar summary judgment framework to this PIA case, the takeaway is that "[s]ummary judgment compelling disclosure under the PIA may only be granted if the movant shows the information is subject to disclosure as a matter of law." *Uvalde Consol. Indep. Sch. Dist. v. Tex. Tribune*, 720 S.W.3d 466, 480 (Tex. App.—San Antonio 2025, no pet.). The general "right to access" afforded under the PIA is subject to numerous exceptions that "embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *City of Dallas*, 509 S.W.3d at 251 (quoting *Cox*, 343 S.W.3d at 114). If the movant demonstrates that the documents meet the criteria for disclosure under the PIA, the nonmovant then bears the burden of presenting evidence to raise a fact issue with respect to the applicability of any PIA

exception. *See Uvalde*, 720 S.W.3d at 480–81.

## II. The Trial Court Erred by Ordering DPS to Produce Records that Were Not in DPS's Possession When the PIA Requests Were Made.

In its first issue, DPS argues that it had no legal obligation under the PIA to produce "many of the documents" the News Organizations requested because they either "did not exist or were not in DPS's possession when the requests were made." DPS contends that the News Organizations are only entitled to the records available as of the date that the News Organizations made their requests and not to any records sent to or created by DPS after the requests were made, which they argue are non-responsive. It is undisputed that the PIA does not compel disclosure of records not in existence as of the date of the PIA requests. *See A & T Consultants*, 904 S.W.2d at 676 (holding that the PIA "compels disclosure of public information that is in existence, but it does not require a government entity to prepare or assemble new information in response to a request."). Nevertheless, the News Organizations contend that DPS waived any objection to disclosure by failing to raise an objection to disclosure of these documents in its response to the summary judgment motion.

We agree with the News Organizations that DPS never challenged the absence of a legal basis for compelling disclosure of documents that were not in DPS's possession at the time of the PIA requests, but we hold that DPS had no obligation to do so. That is because, at the summary judgment stage of proceedings, the News Organizations had the burden as movants to show that no genuine issue of material fact exists that such information is subject to disclosure and that they are entitled to judgment as a matter of law. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014); Tex. R. Civ. P. 166a(c). If the News Organizations do not satisfy this burden, "the burden does not shift and the non-movant need not respond

15

or present any evidence." *Amedisys*, 437 S.W.3d at 511.

It is a fundamental principle of Texas procedure that a nonmovant has no "burden to respond to a summary judgment motion unless the movant conclusively establishes its cause of action or defense. The trial court may not grant summary judgment by default because the nonmovant did not respond to the summary judgment motion when the movant's summary judgment proof is legally insufficient." *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999) (citations omitted); *Amedisys*, 437 S.W.3d at 511. Consequently, on appeal, the non-movant is free to challenge the "legal sufficiency of the grounds presented by the movant" even if the movant failed to make such a challenge below. *Amedisys,* 437 S.W.3d at 512 (quoting *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993)); *see also* Judge David Hittner et al., *Summary Judgments in Texas: State and Federal Practice*, 62 S. Tex. L. Rev. 99, 235 (2022).

Here, the court granted summary judgment compelling the disclosure of documents that undisputedly were not in DPS's possession at the time of the PIA requests. That judgment now must "stand or fall on [its] own merits," and DPS's failure to challenge the legal support for that conclusion below cannot "supply by default the summary judgment proof necessary to establish" the News Organizations' right to summary judgment. *Amedisys*, 437 S.W.3d at 511–12. Summary judgment may only be granted if the "movant shows the information is subject to disclosure as a matter of law." *Uvalde*, 720 S.W.3d at 480. The News Organizations brought this suit under Section 552.321(a) of the Texas Government Code, which allows a requestor under the PIA to "file suit for a writ of mandamus compelling a governmental body to make information available for public inspection if the governmental body . . . refuses to supply public information . . . that is not excepted from disclosure under Subchapter C." Tex. Gov't Code § 552.321(a).

16

Consequently, the News Organizations had the burden to conclusively show that the requested information constitutes "public information" in the first instance, which the PIA defines to include information "collected, assembled, or maintained" by a governmental body. *Id.* § 552.002(a).

DPS argues that it would be impossible for DPS to collect, assemble, or maintain information that is not in its possession. The News Organizations do not argue otherwise. Common sense informs us that unless information is in the possession of a governmental body, it cannot be collected, assembled, or maintained by that governmental body. Not surprisingly, Texas courts recognize that information that a governmental body does not possess at the time of the request cannot be the subject of a mandamus action. *A & T Consultants*, 904 S.W.2d at 676 ("[The PIA] compels disclosure of public information that is in existence, but it does not require a government entity to prepare or assemble new information in response to a request."); *see also City of El Paso*, v. *Abbott*, 444 S.W.3d 315, 326–27 (Tex. App.—Austin, 2014, pet. denied) (explaining that a local government had not refused to turn over information to a requestor under the PIA when it did not have the information). ORD—the agency charged with interpreting the PIA—has also concluded that "[o]nly that information in existence is subject to disclosure" under the PIA. Tex. Att'y Gen. ORD-555 at 1 (1990). As such, the News Organizations have not conclusively proven that the PIA compelled disclosure of information that was not in existence or not yet in DPS's possession as of the PIA request dates. Because the News Organizations had the burden of proof on this issue, DPS had no obligation to assert its legal challenge to the disclosure of such information in the trial court before asserting that challenge here.

The News Organizations respond that DPS has conceded its way into compelled disclosure of the information at issue that was not in DPS's possession as

of the date of the PIA requests. They contend that DPS, in the proceedings below, "directly placed at issue the 2.8 terabytes of information it holds" when it "referenced [its] full investigative file as being subject to disclosure and stated the contents encompassed 2.8 terabytes of data," and also when it "created the three spreadsheets of responsive information" that are attached to the final judgment. DPS's references below to the full 2.8 terabytes of data must be considered in context. When DPS acknowledged the entire amount of responsive data in its summary judgment response, DPS did so as part of its conditional argument that the trial court should allow "sufficient time" to make "appropriate redactions" *if* the trial court "determines that any part of the [summary judgment] motion should be granted . . . ." DPS did not concede that the information itself is subject to disclosure under the PIA.

As to the three spreadsheets, the News Organizations did not conclusively establish that DPS waived any protection from disclosure of these documents. Examining the record, it appears DPS shared the three spreadsheets only after the trial court granted summary judgment and ordered the parties to determine which information was subject to mandatory redaction.[12] By accounting for a contingency in its summary judgment response and complying with a trial court order after losing on summary judgment, we hold there is at least a fact issue as to whether DPS intentionally relinquished or intentionally acted inconsistent with its argument that documents created or received after the News Organizations' requests are non-responsive. *In re Gen. Elec. Cap. Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) ("Waiver requires intent, either the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'") (quoting *Sun Expl. & Prod. Co. v.*

---

[12] The record evidences that the hearings at which the trial court considered the spreadsheets and the final judgment all occurred after the trial court's summary judgment order.

*Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).

For purposes of clarity, we emphasize that we do not hold here today that the information alleged to be received or created after the News Organizations' requests were made is non-responsive. DPS did not file its own summary judgment motion on that issue. We only hold, given the stage of the proceedings, that the News Organizations have not met their burden to conclusively show that they are entitled to this information as a matter of law. We sustain DPS's first issue.

### III. The Trial Court Erred by Granting Summary Judgment on the Law Enforcement Exception.

In its second issue, DPS argues that the trial court erred by granting summary judgment for the remaining withheld information—information in DPS's possession at the time the News Organizations' requests were made—because DPS raised fact issue on whether the law enforcement exception applies to preclude disclosure of those documents. DPS urges us to reverse because it presented evidence that the information at issue was "collected for law-enforcement purposes," such as for "assisting the Uvalde district attorney in criminally prosecuting" certain individuals who may have criminal responsibility and "evaluating how law enforcement should adjust its strategies to prevent further tragedies."

#### A. DPS's Burden

Before turning to the legal analysis, we first resolve the question of what burden DPS was required to carry to avoid summary judgment. The News Organizations argue that "the burden rests on the governmental body seeking to withhold records to show that an exception applies" that would preclude disclosure. This is an accurate statement of DPS's burden at trial,[13] but it is not an accurate

---

[13] The case that the News Organizations cite for this premise is not a summary judgment case, but rather an appeal from a judgment issued after a bench trial. *See Harlandale Indep. Sch. Dist. v.*

statement of DPS's burden at this summary judgment stage of proceedings. "While it is correct that in a PIA case, the governmental body . . . seeking to withhold information bears the burden *at trial* of demonstrating that the requested information" falls within an exception, "on a traditional summary-judgment motion not involving a purely legal question, the *movant's* burden to conclusively negate an element of the nonmovant's claim remains the same as in any other case involving a traditional summary-judgment motion." *Univ. of Tex.*, 2017 WL 1315374, at *5 (second emphasis added) (internal citations omitted). When the nonmovant raises a PIA exception in response to a summary judgment motion, the nonmovant's burden is to come forward with summary judgment evidence sufficient to raise an issue of fact. *Uvalde*, 720 S.W.3d at 482.

> As explained in McDonald & Carson's *Texas Civil Practice* treatise, when
>
> the plaintiff moves for a traditional summary judgment in an action in which the defendant has pleaded an affirmative defense, the plaintiff is entitled to summary judgment if it is demonstrated that there is no material factual issue on the elements of the claim, unless the defendant comes forward with a showing that there is a disputed fact issue as to each element of the affirmative defense.

3 ROY W. MCDONALD & ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 18:8 (2d. ed. 2026). "The defeat of a summary judgment by an affirmative defense, where fact issues only need be raised, is carried by a much lesser burden than seeking a summary judgment based on an affirmative defense, where each element of the defense must be established as a matter of law." *Id.* DPS's burden at this juncture was to present evidence sufficient to raise a fact issue on the exception's application, a lighter burden than DPS must shoulder at trial. We therefore turn to the evidence

---

*Cornyn*, 25 S.W.3d 328 (Tex. App.—Austin 2000, pet. denied). In that case, the school district was required to prove at trial and did prove as a matter of law that an exception to PIA disclosure applied to the information at issue. *Id.* at 333.

to see if that burden is satisfied.

## B. Interpreting the Law Enforcement Exception

The law enforcement exception "excepts from disclosure information which would reveal law enforcement techniques to the public, unduly interfere with law enforcement, and make it more difficult for an agency to do its job." *A & T Consultants*, 904 S.W.2d at 678; *see* Tex. Gov't Code § 552.108. On appeal and in the trial court, DPS argued that it raised a fact issue with respect to the applicability of Texas Government Code subsections 552.108(a)(1) and (b)(1). Section 552.108(a)(1) provides that "[i]nformation held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of a crime is excepted" from required disclosure if "release of the information would interfere with the detection, investigation, or prosecution of crime." Tex. Gov't Code § 552.108(a)(1). Section 552.108(b)(1) provides that "[a]n internal record or notation of a law enforcement agency or prosecutor that is maintained for internal use in matters relating to law enforcement or prosecution is excepted" from disclosure if "release of the internal record or notation would interfere with law enforcement or prosecution." *Id.* § 552.108(b)(1).[14]

Construing this statutory language is a matter of first impression for this Court, but we do not sail in the dark. The Texas Supreme Court has stated that "[b]ecause the PIA is modeled on the FOIA [Freedom of Information Act], federal precedent is persuasive, particularly where the statutory provisions mirror one another." *Tex. Comptroller of Pub. Accts. v. Att'y Gen. of Tex.*, 354 S.W.3d 336, 342

---

[14] DPS relies exclusively on the law enforcement exception in this appeal, and none of the other exceptions or grounds raised in the trial court, because DPS asserts it is "dispositive." We note that the News Organizations also allege that DPS has invoked Section 552.108(a)(2) and (b)(2) of the law enforcement exception. Because DPS in its reply brief disclaims any reliance on these provisions at this juncture, we do not address this argument.

(Tex. 2010); *see Uvalde*, 720 S.W.3d at 477. Similar to the Texas law enforcement exception, 5 U.S.C. section 552(b)(7)(A) exempts from FOIA disclosure those "records compiled for law enforcement purposes, the disclosure of which 'could reasonably be expected to interfere with enforcement proceedings.'" *New York Times Co. v. U.S. Dep't of Just.e*, 390 F. Supp. 3d 499, 512 (S.D.N.Y. 2019) (quoting 5 U.S.C. § 552(b)(7)(A)). Given the similarities in the language of the federal and state law enforcement exceptions, we look to federal FOIA precedent here to guide our analysis.

Federal courts routinely hold that information is exempt from disclosure under the federal law enforcement exception whenever criminal investigations are ongoing. As the U.S. Court of Appeals for the D.C. Circuit has put it, "so long as the investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release of evidence, Exemption 7(A) applies." *Juarez v. Dep't of Just.*, 518 F.3d 54, 59 (D.C. Cir. 2008); *Farahi v. Fed. Bureau of Investigation*, 153 F.4th 1283, 1287 (D.C. Cir. 2025). "An ongoing investigation that is likely to lead to future enforcement proceedings is enough to invoke the exemption." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, No. 20-0212 (EGS), 2022 WL 4598537, at *6 (D.D.C. Sept. 30, 2022) (citing *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 926 (D.C. Cir. 2003)). The D.C. Circuit has held that this provision "requires the proceedings to be 'pending or reasonably anticipated.'" *Farahi*, 153 F.4th at 1287 (quoting *Citizens for Resp. & Ethics in Washington (CREW) v. U.S. Dep't of Just.*, 746 F.3d 1082, 1096 (D.C. Cir. 2014)). "Ongoing criminal investigations count as 'proceedings' for these purposes, and the government may show such proceedings simply by attesting to their 'existence.'" *Id.* (citing *CREW*, 746 F.3d at 1097–99).

The News Organizations argue that DPS was required to show that the release

of the withheld information would actually "permit private citizens to anticipate weaknesses in a police department, avoid detection, jeopardize officer safety, and generally undermine police efforts to effectuate the laws of this State." *City of Fort Worth v. Cornyn*, 86 S.W.3d 320, 327 (Tex. App.—Austin 2002, no pet.) (interpreting subsection 108(b)(1)'s application as limited to such scenarios). We disagree. Interpreting the statute as written, DPS's burden here was simply to present evidence that release of the record at issue would "interfere with law enforcement or prosecution" under (b)(1) or "interfere with the detection, investigation, or prosecution of crime" under (a)(1). Tex. Gov't Code 552.108(a)(1), (b)(1). Interfere means to "interpose in a way that hinders or impedes." *Interfere*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/interfere (last visited Mar. 2, 2026). Disclosure may "interfere with law enforcement or prosecution" short of those extreme scenarios in which release would put officers in physical danger or undermine the very ability of officers to enforce the law.

It is well settled that we may not impose our "own judicial meaning on a statute by adding words not contained in the statute's language." *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022) (quoting *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019)). Rather, we must be "[s]ticklers about not rewriting statutes under the guise of interpreting them," "[s]ticklers about not supplanting our wisdom for that of the Legislature," and "[s]ticklers about a constitutional design that confers the power to adjudicate but not to legislate." *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017). Accordingly, we disagree with the Third Court's opinion in *Cornyn* to the extent that it cabined the plain text of subsection 108(b)(1) in ways that modify the statute's plain text.

23

## C. Assessing the Evidence

Turning to the evidence, the summary judgment record largely consists of testimony from District Attorney Mitchell and DPS's Colonel McCraw.

To begin, DPS presented an affidavit from District Attorney Mitchell in which she testified that "the information requested by [the News Organizations] is evidence which is necessary for the review by [her] office as to potential criminal charges" and that releasing the information sought would "severely undermine [her] mandate and responsibility" as the District Attorney for the jurisdiction where the shooting occurred to "see that justice is done in a fair and impartial manner . . . ." She attested that it is her duty to "determine if actions, conduct or inactions . . . rise to the level of a felony criminal offense," and that justice "cannot be accomplished unless there is a thorough investigation buttressed by fairness, integrity, and impartiality free from political and media pressures."

Mitchell opined that her office will be questioning many witnesses and needs such "testimony to be uninfluenced by media accounts." She alleged that this has already become an issue as one interviewed witness said "that they cannot remember if what they are stating to investigators is their individual and personal recollection from the event or from events reported by and in the media." At bottom, Mitchell opined that disclosing the information "would ultimately leave [her] office, the families of the deceased and injured children, the other victims, and the overall Uvalde community with an investigation for which a valid prosecution could not be dependent."

DPS did not rest on that affidavit alone. DPS bolstered Mitchell's affidavit testimony with her hearing testimony from the *Gutierrez* case—a different PIA mandamus action seeking much of the same information the News Organizations

24

seek here.[15] First, she explained that the dangers of releasing such information are often obvious in situations where investigations have commenced but prosecutions have not. Mitchell testified that a prosecutor does not want the contents of an investigation to be released mid investigation or prior to the District Attorney making a decision whether or not to convene a grand jury because "people, witnesses change their stories, they lawyer up. So if a suspect does not know that they are a target of an investigation, then they are more apt to cooperate, provide statements . . . ."

Second, she testified to the adverse effect that releasing information can have on evolving investigations. Mitchell explained that investigations may evolve with time, as this one had, and that prematurely releasing information can adversely affect the investigations:

> [P]eople came out and made statements that, based on what we believed we had the first day or so. But once the investigation was broadened and we're looking at other things, we had to correct that. Now, those statements were given, again, not intentionally to mislead, but just because that's what we thought we had. And that happens in an investigation. You think you are going down this way, and you end up going down another path because the facts take you a different place. That's why any release of any information adversely affects what we are trying to discover in this case.

---

[15] *Gutierrez v. Tex. Dep't of Pub. Safety*, No. D-1-GN-22-002848 (419th Dist. Ct., Travis County, Tex. June 22, 2022). In an amicus brief filed in *Gutierrez*, the News Organizations acknowledged that "some of the public information sought by one of the Intervenors in the *Gutierrez v. DPS* case and at issue before this Court is the same as that sought by" the News Organizations, including:

> recordings of 911 calls, radio traffic, and other calls; recordings of body camera, dashboard camera and surveillance cameras; timelines, interview notes and other materials; incident reports, toxicology reports, ballistic reports and other reports; lists of DPS personnel who responded to Robb Elementary; and email, text and other communications sent or received by DPS officers.

Like DPS, the News Organizations included the *Gutierrez* transcript in their summary judgment evidence.

Third, she testified to the potential for harm from releasing only part of the information. Mitchell explained that releasing part of the requested information had presented an incomplete picture of events:

> So the release of the hallway video, it's one slice of a huge and ongoing investigation, not complete yet. And without the contextual explanation of what is being seen in the hallway, it just raises more questions than answers and re-traumatizes the victims . . . . [W]ithout everything else, it's incomplete . . . . And I ask [the families and victims] for their patience so we can get a complete and thorough investigation, for the DPS and FBI to complete that process, so that it can then be submitted to my office for review.

According to Mitchell, releasing body camera footage without also releasing information that would provide more context to the footage would create public confusion that would be harmful to the investigation:

> [U]ntil I see all the body cam footage and . . . the transcriptions for that, it's hard to say how the release of that would be okay in the public . . . because when you see a body cam video, right, it's a two-dimensional depiction of a three-dimensional event, right? So . . . as a trial lawyer, when you watch a body cam, you have to go back and talk to the officer, because the things that you think you have seen are not the complete picture of what transpired at that time . . . . So I think that releasing the body cam would be adverse, because until you speak to the officers and get an explanation as to what you are watching, it's an incomplete assessment.

Fourth, Mitchell testified that the existing disclosures had already created difficulties for the investigation. When asked whether the "disclosures that have already occurred" had "negatively impacted [her] ability to do [her] job," she responded, "[a]bsolutely." She cited two examples: (1) the ALERRT report, which contained an inaccuracy regarding an officer's opportunity to take a shot at the gunman before he entered the school, and (2) a witness who "changed her statement saying that the house committee report was inaccurate."

26

Finally, Mitchell testified that given the significant potential that the disclosure would interfere with the investigation and prosecution process, it would only be appropriate to release the information only if a final decision was made to bring no prosecutions against law enforcement officers who responded to the shooting. According to Mitchell, disclosure of the requested information would be proper only if there was no prosecution—a decision that she had not yet made:

> I have explained . . . the only way that somebody can have the position that the release of any of this investigation at this time is appropriate is if that individual has already decided that there will never be any criminal charges, right? There will never be any criminal charges; therefore, it's of no consequence if we release all this information to the public. And I've explained to them that that is not a decision that I have made . . . . I want the opportunity to review a complete and thorough investigation that has not been compromised to make that decision . . . .

DPS Colonel McCraw also testified at the *Gutierrez* hearing. He explained that DPS was performing both an internal investigation and an ongoing criminal investigation focused in large part on the officers who responded to the shooting, that Mitchell was responsible for deciding whether any of the officers had any potential criminally culpability, and that DPS would seek to avoid interfering with any potential prosecution by her office. Colonel McCraw testified to all of the following:

- "The criminal investigation . . . is ongoing and . . . relates to the officer involved shooting, but also any criminal culpability as it relates to the entire incident. And we have an internal investigation that's looking at our people, okay."

- "[Mitchell] made it clear that she was going to review all the totality of the investigation and determine whether there's going to be criminal culpability on any one of the officers that were involved in the response."

- "[We] defer to the District Attorney and her expertise, but I know she's looking at the actions and inactions of every officer in that hallway."

27

- "I can tell you another complicating factor, especially in an investigation like this, is when we have law enforcement personnel and their actions or inaction are in question, it's vitally important that we do a comprehensive and thorough investigation. And then we don't want to do anything that hurts the potential for the D.A. to prosecute our law enforcement officers if there's any criminal culpability. We're mindful of that, and the relationship that we have [with] district attorneys is very important."

## D. Applying the Summary Judgment Standard to the Evidence

We review the evidence in the light most favorable to DPS, indulging every reasonable inference and resolve any doubts in the DPS's favor, crediting favorable inferences to the nonmovant if reasonable jurors could do so. *Samson Expl., LLC v. T.S. Reed Props., Inc*., 521 S.W.3d 766, 774 (Tex. 2017). To withstand summary judgment, DPS need only supply more than a mere scintilla of evidence to raise a fact issue with respect to the law enforcement exception—a threshold met "when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch*, 118 S.W.3d at 751.

Viewed in the light most favorable to DPS, we hold that the testimony from Mitchell and McCraw raises a genuine dispute of material fact that releasing the remaining requested information withheld by DPS would interfere with an ongoing investigation into the shooting at Robb Elementary, the prosecution of any law enforcement officers resulting from their actions or inactions at the school that day, or both under Section 552.108(a)(1) and (b)(1). Mitchell and McCraw explain with sufficient detail how release of information will taint or impair the ongoing investigations and potential prosecutions here. Such testimony includes, but is not limited to: a witness changing her statement after the House Committee report on the shooting was released and an error contained in the released ALERRT report already interfering with Mitchell's investigation, how release of bodycam and hallway video of the incident without corresponding statements from individuals on

28

the scene presents an incomplete picture of events, and how premature release of information can lead to potential witnesses changing their stories. Reasonable and fair-minded persons could certainly conclude that releasing 2.8 terabytes of information to news organizations—information which includes body camera footage, law enforcement call logs, and sensitive communications—might interfere with the investigation and the ability to bring charges based on any crimes related to the significant delay in law enforcement response.

This testimony by Mitchell and McCraw is precisely the sort of testimony that has justified federal agencies in withholding information from disclosure under the law enforcement exception to the Freedom of Information Act—the federal law upon which the Texas PIA is modeled.[16] We disagree with the News Organizations that this testimony was conclusory. Under FOIA, an "ongoing investigation that is likely to lead to future enforcement proceedings is enough to invoke the exemption." *Citizens for Resp. & Ethics*, 2022 WL 4598537, at *6. "Ongoing criminal investigations count as 'proceedings' for these purposes, and the government may show such proceedings simply by attesting to their 'existence.'" *Farahi*, 153 F.4th at 1287 (citing *CREW*, 746 F.3d at 1097-99).

In *Farahi*, a man suspected of possessing connections to high-level terrorists submitted a FOIA request for his FBI file, which contained some 10,750 pages and 80 CDs with potentially responsive information. *Id.* at 1285. The FBI released some records but withheld most of them. *Id.* In moving for summary judgment on the FOIA law enforcement exception, the FBI submitted a declaration from Section Chief David Hardy establishing the pendency of enforcement proceedings and

---

[16] The purpose underlying the exemption is to "prevent harm to the government's case ... by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have." *Conti v. U.S. Dep't of Homeland Sec.*, No. 12-CV-5827-AT, 2014 WL 1274517, at *22 (S.D.N.Y. Mar. 24, 2014).

giving details about the nature and scope of the investigation along with a subsequent declaration from a new interim chief that the investigation—which had been pending for "several years"—remained ongoing. *Id.* The trial court granted the FBI's summary judgment motion and the D.C. Circuit affirmed. *Id.* at 1285, 1288. The D.C. Circuit reasoned that the "public Hardy declaration explained that disclosure of information regarding an ongoing investigation could reasonably be expected to interfere with it by tipping off the targets about the scope of the investigation—a widely accepted justification in Exemption 7(A) cases." *Id*. (citing *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 929 (D.C. Cir. 2003)). Based on the FBI's public and sealed declarations, the D.C. Circuit held that the FBI had met its burden to show that the documents were exempt from disclosure. *Id.* at 1287–88.

Similarly, the United States District Court for the Southern District of New York held that this exception justified withholding from disclosure to the New York Times (1) an FBI report "of specific and identified threats, including threats of bombing at schools and school shootings, including quotes from threats received" and "references [to] ongoing FBI investigations," and also including "particular factual details of interest to the FBI," and (2) a "memorandum" from the Department of Homeland Security (DHS) that included a "summary of public safety incidents at schools[,]" including "active DHS public safety investigations." *New York Times Co. v. Dep't of Educ*., 658 F. Supp. 3d 171, 196 (S.D.N.Y. 2023) (alteration in original). The court's review focused on affidavit testimony from FOIA Service Center Director Gregory Smith that the "documents relate to ongoing law enforcement proceedings, namely investigations into school safety incidents." *Id*. Smith explained the "types of harms that are reasonably likely to occur should these records be disclosed" and proffered that "release of the records 'could alert current investigatory targets as to the existence and/or scope of an open investigation, thus

30

impeding the investigation.'" *Id.* at 197. Smith's testimony, together with the documents, satisfied the court that the records were exempt from disclosure as a matter of law due to the potential for interference with law enforcement investigations. *Id.*

We find the reasoning in these cases persuasive. Relying on testimony similar to that in the summary judgment record here, these courts held that the government had established the right to withhold the documents as a matter of law. Here, DPS does not shoulder so great a burden. DPS simply had to present testimony raising a fact issue that would allow fair and reasonable people to differ in their conclusions about whether releasing the information would interfere with an investigation or potential prosecution. Taken together, the testimony of Mitchell and McCraw clears this bar. It is well settled that, at the summary judgment stage, *all evidence* favorable to the nonmovant will be taken as true if reasonable jurors could do so in deciding whether there is a disputed issue of material fact. *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 279 (Tex. 2017). All reasonable inferences, including any doubts, must be resolved in DPS's favor. *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Border Demolition & Env't, Inc. v. Pineda*, 535 S.W.3d 140, 151 (Tex. App.—El Paso 2017, no pet.). It is not for us to decide here whether this evidence is conclusive, but it raises a fact issue, and that is enough to prevent the News Organizations from meeting their burden to conclusively establish they are entitled to judgment as a matter of law.

The News Organizations make three additional challenges to the adequacy of the testimony to raise a fact issue. First, they contend that disclosing the requested information is "unlikely to interfere with any law enforcement purpose" because "many key facts" regarding law enforcement's response to the shooting "have already been made public" through disclosures to ALERRT and the Legislature or

31

by McCraw during public comments. This appeal is not from a final judgment in which we would defer to the trial court's implied findings supported by the record as to whether an investigation is complete. *See PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 603 (Tex. 2025). It is an appeal from a traditional motion for summary judgment in which we credit evidence favorable to the nonmovant if reasonable jurors could, and disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Zive*, 644 S.W.3d at 173; *Mann Frankfort*, 289 S.W.3d at 848. Here, there is some testimony that the investigation—which had just begun when the PIA requests were made—was ongoing and that disclosure of the withheld information would hinder that investigation. Because reasonable jurors could credit this testimony, we are required to credit it as well. Moreover, it does not follow that simply because some information has been released,[17] no harm would come to the investigation or future prosecution from releasing 2.8 terabytes of information that includes body camera footage and law enforcement communications that were made during the law enforcement response.

We also agree with the First Court of Appeals' holding that "the right to exclude information from disclosure 'does not dissolve simply because that information may be available to the public in some form.'" *Tex. Appleseed v. Spring Branch Indep. Sch. Dist.*, 388 S.W.3d 775, 780 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (quoting *Tex. Comptroller*, 354 S.W.3d at 343). DPS does not dispute that if it voluntarily treats information as public, the public should have access to it. *See* Tex. Gov't Code § 552.007(b). "But once that information is disclosed, it is only *that* specific information that must be made available to any person." *Tex. Appleseed*, 388 S.W.3d at 780 (citing Tex. Gov't Code § 552.007(b)); *Wolf v. Cent.*

---

[17] DPS "does not dispute that information that the agency has already deliberately and voluntarily made public is public information that should be shared with requestors under the PIA."

32

*Intel. Agency*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice.").

Second, the News Organizations also object that the law enforcement exception can have no application as a matter of law because the investigation is complete and two officers have been indicted. Here, McCraw and Mitchell both testified that the investigation is ongoing—testimony that we must credit. The D.C. Circuit has held that "so long as the investigation continues to gather evidence for a possible future criminal case, and that case would be jeopardized by the premature release of that evidence, Exemption 7(A) applies." *Juarez*, 518 F.3d at 59. We hold that the same is true with respect to the PIA's law enforcement exception. As in *Juarez*, the "affidavits here informed the district court that the criminal investigation remained ongoing, and from that the district court could reasonably infer that this investigation may eventually lead to a prosecution." *Id.* That is enough to avoid summary judgment.

Moreover, it is undisputed that two officers were indicted and prosecutions were ongoing. The ordinary meaning of "prosecution" is not limited to the indictment stage but also includes trial. *Prosecution*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A criminal proceeding in which an accused person is tried . . . ."); *cf.* Tex. Gov't Code § 552.108(a)(2) (information that deals with the detection, investigation, or prosecution of crime is excepted from disclosure when it relates to "an investigation that did not result in conviction or deferred adjudication . . . ."). Future indictments could follow. On this record, and adhering to our standards of review, the applicability of the law enforcement exception cannot be ruled out as a matter of law.

Third, the News Organizations also dispute that Section 552.108(a)(1) applies here because "every possible suspect" is already aware of the investigation and

33

potential prosecution, and so disclosing the information would not allow them to change their "stories" before confronting investigators. Even assuming this to be true, awareness of the existence of an investigation and potential prosecution is not the same as awareness of the information collected and held pursuant to such an investigation or prosecution. The News Organizations have presented no evidence that possible suspects have reviewed the full 2.8 terabytes of data and therefore know all of what DPS is withholding. Without a complete picture of the events at the school, including who did what where and when, there is at least a fact issue as to whether a possible suspect could tailor his or her story if the information is disclosed. *See 20801, Inc.*, 249 S.W.3d at 399 (requiring court to indulge reasonable inferences in the nonmovant's favor). It is also possible that releasing the information could influence someone who was *not* a suspect, an interference that Mitchell attested had already occurred.[18]

In summary, this case confronts us with an extraordinary loss of innocent life, a chaotic scene involving an extraordinary number of law enforcement responders, and an extraordinary public need for justice. In these circumstances, we do not hold today that the information sought by the News Organizations may forever be shielded from public view. After all, there is "no reason to protect yellowing documents contained in long-closed files." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980). But for purposes of our analysis today,

---

[18] As an attorney for the State argued in *Gutierrez*:

> [T]he idea that an audio call doesn't change and, therefore there is no harm in releasing it, that's just not true. The audio call doesn't change, but people's testimony or recollection after hearing the call could change. Witness stories can pivot, potential criminal suspects in a subsequent prosecution can pivot and change their stories and lawyer up. And even people that don't have any intent to try to cover up their own culpability could . . . read all the witness statements and adjust their testimony.

it is enough that there is testimony that the investigation remains ongoing and prosecutions are not yet complete. That testimony precludes us from holding as a matter of law that releasing the extraordinary scope of information sought here would not interfere with the investigation of a crime or the prosecution of a crime. Accordingly, DPS has carried its burden of avoiding summary judgment.

### E. The News Organizations' Objections

The News Organizations make two additional arguments for why they are nevertheless entitled to summary judgment on the law enforcement exception. We address each in turn, and we also address a new pertinent case out of the Fourth Court of Appeals addressing a case that may involve similar information.

#### *Specificity*

First, the News Organizations argue that DPS's evidence was insufficiently specific. They argue that DPS "fails to demonstrate how the release of responsive information in this case would ***interfere*** with any specific investigation or broader law enforcement efforts." They also contend that DPS "merely points to vast categories of documents and never explains how their release would" violate the law enforcement exception.

The First Court of Appeals rejected a similar demand for greater specificity in *Texas Appleseed v. Spring Branch Independent School District*. 388 S.W.3d at 780. There, the party seeking information disclosure under the PIA argued that section "552.108 'may be used only to prevent disclosure of very specific information.'" *Id.* The court rejected that argument, refusing to find "any requisite level of detail in the information to be withheld," so long as the evidence was not merely conclusory. *Id.* Examining other cases in which information was withheld from disclosure, the court reasoned that "[s]howing that withholding of specific information has been upheld does not necessarily mean that specific information is required. Instead, our concern

35

is whether 'release of the internal record or notation would interfere with law enforcement.'" *Id.* at 781 (quoting Tex. Gov't Code 552.108(b)(1)).

We agree with the First Court of Appeals and find that there is no heightened specificity requirement for evidence to raise a fact issue on the law enforcement exception. Although DPS will carry the burden at trial of proving the exception's applicability, nothing in the statute required DPS to go file-by-withheld-file through 2.8 terabytes of information to explain why its release would interfere with the detection, investigation, or prosecution of a crime or interfere with law enforcement or prosecution. Indeed, at the summary judgment hearing, the News Organizations took the position that the trial court did not have to review any of the withheld information—"at least *vis a vis* those records withheld under § 552.108." While the News Organizations chose to organize their information requests into various "categories of information" in their summary judgment motion, nothing in Rule 166a required DPS to adopt the News Organizations' categorizations and tailor the summary judgment testimony to those categories.

Because there is no statutory requirement for greater specificity, this case is distinguishable from another PIA case that the News Organizations cite, *Genuine Parts Co., Inc. v. Paxton*. No. 03-19-00441-CV, 2020 WL 3887973, at *1 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). In *Genuine Parts*, the issue was whether a settlement agreement between a company selling automative parts and services and the City of Houston should be excepted from disclosure under Section 552.110(b) of the Texas Government Code because disclosure would cause substantial competitive harm to the company. *Genuine Parts*, 2020 WL 3887973, at *1, *5. The company relied on an affidavit attesting that a competitor would use the agreement to outbid the company when the company's contract with the City of Norfolk was up for renegotiation. *Id.* at *5. The Court held that the affidavit did "not

rise to the level of specificity" required by Section 552.110, which expressly requires that "*specific factual evidence*" be provided to show disclosure would result in substantial competitive harm. *Id.* (quoting Tex. Gov't Code § 552.110(b)). Unlike Section 552.110(b), the law enforcement exception does not call for "specific factual evidence."

The D.C. Circuit's analysis in *Farahi* also supports our conclusion here. In that case, the FBI justified withholding most of an FBI file which included some 10,750 pages and 80 CDs with potentially responsive information based on the FOIA law enforcement exception, and the D.C. Circuit affirmed the trial court's summary judgment for the FBI. *Farahi*, 153 F.4th at 1285. Farahi argued that the FBI's categories of information were overbroad but did not make any specific explanation for why they were inadequately specific. *Id.* at 1288. As in *Fahari*, the News Organizations have not demonstrated why DPS would need to categorize the documents more narrowly to avoid summary judgment.

### *The News Organizations' PIA Authorities*

Second, the News Organizations contend that courts have held in several instances that affidavits did not raise a fact issue as to the applicability of various PIA exceptions, citing multiple Texas intermediate court decisions. *See Cornyn v. City of Garland*, 994 S.W.2d 258, 266 (Tex. App.—Austin 1999, no pet.); *Cooper v. Circle Ten Council Boy Scouts of Am.*, 254 S.W.3d 689, 700 (Tex. App.—Dallas 2008, no pet.); *Abbott v. City of Corpus Christi*, 109 S.W.3d 113, 119 (Tex. App.—Austin 2003, no pet.). We do not dispute that affidavits may sometimes be insufficient to raise a fact issue as to an exception's applicability—that determination must be made on a case-by-case basis. The guiding standard is whether the party raising the exception met its burden to demonstrate a fact issue. *Thomas*, 71 S.W.3d at 490.

The cases that the News Organizations cite do not involve the law enforcement exception. Rather, they involve circumstances not at play here. In *Cornyn*, the issue was whether a city waived a PIA exception allowing confidentiality for documents related to litigation by allegedly disclosing such documents previously. *Cornyn*, 994 S.W.2d at 265. The requestor, a news organization, relied on an affidavit of one of its reporters attesting that the city allowed the reporter to examine and copy the documents at issue. *Id* at 266. The Court held that, assuming the allegations in the affidavit were true, the exception did not apply because either (1) the requestor already has the documents and so the issue is moot or (2) the requestor does not have the documents and so the city did not waive the exception by previously disclosing them. *Id.* at 266.

In *Cooper*, the issue was whether a company was a governmental body under the PIA because it was allegedly supported in part by public funds. *Cooper*, 254 S.W.3d at 700. The Court held that requestor Cooper's evidence, which included an affidavit, was insufficient to raise a fact issue because the evidence did not show that the company received public funds or otherwise contradict evidence presented by the company that no such funds were received. *Id.* In *Abbott*, the applicability of the relevant PIA exception to the information at issue depended on a police officer *not* having received disciplinary action. *Abbott*, 109 S.W.3d 118–19. The affidavit in that case averred the opposite and so the Court rejected that it established confidentiality. *Id.* at 117, 119.

The case at bar differs from the above cases in every significant respect. Here, we are reviewing for evidence that releasing the information would interfere with a criminal investigation or prosecution. Mitchell and McCraw attest with sufficient detail how release of information will taint or impair the investigations and potential prosecutions here, even pointing to past incidents where disclosure has already done

so. And taking Mitchell and McCraw's testimony as true does not contradict or moot the applicability of the PIA exception at issue as in *Abbott* or *Cornyn*. Rather, doing so raises a genuine dispute of material fact as to the exception's applicability.

### *The Fourth Court of Appeals Opinion*

Although the opinion issued after briefing was complete in this case and the parties have not cited it, we nevertheless address the Fourth Court of Appeals' opinion in *Uvalde Consolidated Independent School District v. Texas Tribune*, which may involve information similar to that at issue here. 720 S.W.3d 466. In that case, in response to various news organizations' summary judgment motions, Uvalde Consolidated Independent School District and Uvalde County raised the law enforcement exception to prevent disclosure of said information. *Id.* at 472, 480. As here, the news organizations in that case filed a writ of mandamus to compel the government entities to produce the requested information followed by a summary judgment motion, which the trial court granted. *Id.* at 472. On appeal, however, the Fourth Court held that the government entities failed to raise a genuine issue of material fact on the question of the law enforcement exception's application. *Id.* at 481. The Fourth Court reasoned that the evidence that the government entities provided in support of the exception's applicability—which consisted merely of a motion to preserve evidence and copies of grand jury summonses—was insufficient to raise a fact issue because the government entities did not "provide any detail or context for their decision to withhold the documents at issue." *Id.* at 481–83. The Court concluded that "[w]ithout such an explanation, any conclusion regarding the content of the withheld documents and the effect of their disclosure is pure speculation." *Id.* at 483.

We do not have the evidence considered in *Uvalde* before us, but the evidence in this case does "explain[] how disclosure" of the categories of information at issue

39

"would interfere with any ongoing investigation" and potential prosecutions with sufficient specificity. *See id.* at 481. As discussed in Part III, Mitchell and McCraw both supplied testimony on why disclosure of the information at issue would interfere with law enforcement investigations and prosecutions. The testimony attests, among other things, that such interference has already occurred as a result of past disclosures of a couple of reports, how witnesses can change their stories when information is prematurely released, and how release of video can present an incomplete picture of events. This evidence is not conclusive, but it is sufficient to raise a fact issue as to the law enforcement exception's applicability and does not render "any conclusion regarding . . . the effect of their disclosure" a matter of "pure speculation." *Uvalde*, 720 S.W.3d at 483. And that is all that is required at this juncture. We sustain DPS's second issue.

## IV. The Trial Court Erred by Ordering the Disclosure of the Federal Agencies' Materials.

In its third issue, DPS argues that the trial court erred by granting summary judgment compelling disclosure of the documents that DPS obtained from federal agencies as part of its investigation into the shooting. DPS argues that "[b]esides being subject to the law-enforcement exemption, a subset of the documents is also exempt from disclosure under federal law . . . ." DPS contends that the federal materials are not "public information" subject to disclosure under the PIA. DPS then argues that, even assuming these materials are "public information," the materials are exempt from disclosure under either the law enforcement exception or FOIA— whether by itself or through incorporation under the PIA. The News Organizations respond that DPS waived most of its arguments besides the law-enforcement- exception argument because such arguments were not raised before the trial court and are otherwise procedurally barred. They further argue that the federal materials are public information and that FOIA does not bar disclosure here. We hold that DPS

40

has raised a fact issue that the federal materials are subject to the law enforcement exception, so we do not reach DPS's other arguments.

We assume without deciding that the federal materials fall within the PIA's definition of "public information" and are subject to the PIA's requirements. Even assuming this to be the case, for the same reasons articulated in Part III, there still is a fact issue as to whether the federal agency materials—together with the DPS materials—are subject to either of the exemptions under Section 552.108. Accordingly, the News Organizations have failed to conclusively establish that release of the federal materials would not interfere with an ongoing investigation and prosecution of the case.[19] Tex. Gov't Code § 552.108(a)(1), (b)(1).

The News Organizations object that DPS's arguments regarding the federal materials are "procedurally barred" for two reasons. Citing Government Code Section 552.305(d)(1), they first argue that DPS failed to "tell the federal agencies from which it obtained information about the Plaintiff's TPIA requests within ten business days of receiving the requests." Section 552.305 covers situations when a governmental body receives a request for information that may involve a third party's privacy or property interests. *Id.* § 552.305(a). Section 552.305 is structured much like Section 552.301—both permit the governmental body to decline to release information pending a request for a decision from ORD, and both contain a provision for giving notice that ORD's decision is being sought. *Compare id.* § 552.301(a), (d) *with id.* § 552.305(a), (d). But the two statutes differ when it comes to noncompliance. Whereas a failure to comply with Section 552.301's notice requirement has a stated consequence—the requested information "must be released

---

[19] As there being a fact issue regarding Section 552.108's applicability to the federal agency materials disposes of this issue, we need not and do not reach the parties' arguments regarding the applicability of FOIA to the materials.

unless there is a compelling reason to withhold" it, *see id.* § 552.302—the Legislature did not include a similar consequence when a governmental body fails to comply with Section 552.305(d)(1)'s notice requirement.

The Texas Supreme Court has held that "when an agency fails to comply with a statutory duty, the Judiciary may impose only consequences that are explicit in the statutory text or 'logically necessary to accomplish the statute's purpose . . . .'" *Image API, LLC v. Young*, 691 S.W.3d 831, 843 (Tex. 2024) (quoting *AC Interests, L.P. v. Tex. Comm'n on Env't Quality*, 543 S.W.3d 703, 713 (Tex. 2018)). Here, the statute does not state that a failure to comply with Section 552.305(d)(1)'s notice requirement means a third party's objections are procedurally barred. Nor do we find that such a result is essential to fulfill the statute's purpose.

The News Organizations next argue that DPS improperly used its summary judgment response to "backdoor" the federal agencies' "unauthenticated and unsworn letters" into the record. But we do not rely on these letters to conclude that there is a fact issue as to whether the federal agencies' materials are subject to withholding under the law enforcement exception. Instead, we rely on the testimony described in Part III.

We sustain DPS's third issue. We therefore REVERSE the order granting the News Organizations' motion for summary judgment.

## THE PLEA IN INTERVENTION

A trial court has broad discretion in determining whether to strike an intervention, but it abuses that discretion if (1) the intervenor has a justiciable interest, (2) intervention "will not complicate the case by excessive multiplication of the issues," and (3) intervention is "almost essential to effectively protect the intervenor's interest." *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990); *In re Union Carbide Corp.*, 273 S.W.3d 152, 154–55

(Tex. 2008) (per curiam); *see* Tex. R. Civ. P. 60. Alleging that disclosure of the DPS material to the News Organizations "could have a detrimental effect on whatever prosecutions her office may pursue" relating to Robb Elementary, District Attorney Mitchell filed a plea in intervention. The News Organizations filed a motion to strike the plea, which the trial court granted.

On appeal, Mitchell argues that she has a justiciable interest insofar as release of the requested information would seriously prejudice any future prosecutions. She also contests the trial court's basis for denying her intervention petition on justiciability grounds—that Mitchell could not be sued in the venue of Travis County—because venue is an irrelevant consideration in assessing whether an intervention is proper. Mitchell further contends that intervention is essential to effectively protect her interest because she has no other avenue apart from this suit to protect her interest and that her intervention will not complicate the case.

The News Organizations respond that Mitchell does not have a justiciable interest and also urge denial of intervention on the ground that Travis County is an improper venue for a suit against Mitchell. Finally, the News Organizations contend that Mitchell's intervention will unnecessarily complicate the case and that intervention is not "almost essential" to protect Mitchell's interest. We agree with the News Organizations that intervention is not almost essential to protect Mitchell's interest.

We assume without deciding that a judgment in favor of the News Organizations would prejudice Mitchell's interest insofar as disclosure of the information at issue would impair Mitchell's future prosecutions by creating adverse effects on potential witnesses and by affecting Mitchell's ability to obtain an impartial jury and a fair trial. Nonetheless, intervention is not "almost essential" to protect Mitchell's interest because her interest is adequately protected in this

litigation. As discussed in Part III.C., DPS introduced an affidavit by Mitchell—attached to its motion for summary judgment response—detailing her objections to the release of the information at issue in this lawsuit. DPS also proffered in its response Mitchell's testimony in the *Gutierrez* case, totaling 48 pages, objecting to the disclosure of information similar to that sought here based on the law enforcement exception. This admitted evidence, paired with the fact that DPS has adopted Mitchell's position as its own, demonstrates that Mitchell's intervention is not "almost essential" to protect her interest.[20]

Mitchell objects that DPS's representation is insufficient to meet this element of the intervention test. According to Mitchell, she must have another avenue to vindicate her interest in her own right, or else the intervention must be allowed. In support, Mitchell cites two Third Court of Appeals opinions in which interventions were held to be inessential to protect the intervenors' interests because there were alternative avenues in which they could be resolved. *Am. Sw. Ins. Managers, Inc. v. Tex. Dep't of Ins.*, No. 03-10-00073-CV, 2010 WL 4053726, at *7 (Tex. App.—Austin Oct. 15, 2010, no pet.) (mem. op.) (holding intervention was inessential because intervenor had "contested the Commissioner's findings in [a related] SOAH action, and can appeal the decision in that action if it is unfavorable."); *Doe v. Carroll*, No. 03-08-00556-CV, 2009 WL 1811002, at *6 (Tex. App.—Austin June 23, 2009, no pet.) (mem. op.) (holding intervention was inessential because intervenors could have filed a separate suit against defendants and obtained a judgment).

Those cases do not state that an almost-essential finding is required absent an alternative litigation forum open to the would-be intervenor. On the contrary, the

---

[20] Because Mitchell's intervention is not essential for her interest to be protected, we do not discuss whether the other two elements of the intervention test were met.

Third Court has recognized that intervention is not essential where the parties to the litigation can adequately protect the intervenor's interests. *Save Our Springs All., Inc. v. City of Kyle*, No. 03-13-00271-CV, 2014 WL 1432090, at \*2 (Tex. App.—Austin Apr. 10, 2014, no pet.) (mem. op.) (holding intervention was inessential where intervenor failed to "identify any additional arguments it would have made or additional evidence it would have submitted" to counter the adverse summary judgment motion at issue and failed to point to "any manner in which [a party with an identical interest] failed to adequately protect the [intervenor's] interest"); *City of Austin v. Quick*, 930 S.W.2d 678, 683 (Tex. App.—Austin 1996) (holding intervention was inessential because the trial court did not abuse its discretion in determining that a party to the litigation "could have effectively represented [intervenor's] interests *at the time of trial.*"), *aff'd*, 7 S.W.3d 109 (Tex. 1998).

Here, too, Mitchell's interests are adequately protected by a party to the litigation. DPS has proffered an affidavit by Mitchell directly supporting DPS's position and has also cited extensive testimony by Mitchell in a related case on the same issue. DPS has also deferred to Mitchell's position wholesale. Mitchell responds that she and DPS may be aligned on the issues at this moment, but there is no guarantee that such comity will remain in the future. Perhaps, but it is undisputed that there is alignment now and we decline to hold in this appeal that intervention is proper based on speculation, unsupported by evidence, of a future break between DPS and Mitchell.

Consequently, the trial court did not abuse its discretion in granting the News Organizations' motion to strike. We overrule Mitchell's issue.

## CONCLUSION

Having sustained DPS's issues challenging the summary judgment and overruling District Attorney Mitchell's issue challenging the trial court's order

striking her plea in intervention, we affirm the trial court's denial of the plea in intervention, reverse the remainder of the judgment, and remand this case to the trial court for further proceedings consistent with this opinion.

<u>s/ April Farris</u>
April Farris
Justice

Before Chief Justice Brister and Justices Field and Farris.